**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RONALD COATS,<br><br>*Plaintiff*,<br><br>v.<br><br>ELISABETH DeVOS,[1] Secretary, U.S.<br>Department of Education,<br><br>*Defendant*. | Civil Action No. 13-2001 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ronald Coats brings this action against his former employer, the United States

Department of Education, for alleged violations of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C.

§ 633a *et seq.* ("ADEA").  Coats claims that he was unlawfully terminated from his position as a

systems accountant in the Department's Office of the Chief Financial Officer ("OCFO") on the

basis of his race and age and in retaliation for his prior EEO activity.  *See* Dkt. 1 at 1 (Compl.

¶ 1).  The Department answered the complaint, Dkt. 11, and, following the close of discovery,

moved for summary judgment on each of Coats's three claims, Dkt. 20.  The Department

contends that Coats was terminated from his position for a legitimate, non-discriminatory

reason—poor work performance—and that there is no evidence in the record from which a

reasonable jury could find that this reason was pretextual.  Coats disagrees, arguing that the

record contains both direct and circumstantial evidence from which a reasonable jury could find

---

[1]  The complaint names former Secretary of Education Arne Duncan as the defendant in this
case.  Pursuant to Federal Rule of Civil Procedure 25(d), his successor, Secretary Elisabeth
DeVos is automatically substituted as the proper defendant to this action.

that the Department's asserted rationale is pretextual and that the Department, in fact, acted for

discriminatory and retaliatory reasons.

As explained below, the Court concludes that the merits of Coats's Title VII claims for

racial discrimination and retaliation turn on disputed issues of material fact and will, accordingly,

deny summary judgment on those claims.  With respect to Coats's ADEA claims for age

discrimination and retaliation, however, the Court concludes that Coats has failed to identify

evidence from which a reasonable jury could find in his favor and will, accordingly, grant

summary judgment in favor of the Department on those claims.

## I.   BACKGROUND

For the purpose of evaluating the Department's motion for summary judgment, the

following facts are construed in the light most favorable to Coats, who is the nonmoving party.

*See Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

Coats, who is African-American, worked at the Department of Education as a systems

accountant from 1991 until he was terminated in early 2013.  Dkt. 22-1 at 7 (Coats Dep. 13);

Dkt. 22 at 28.  At the time of his termination, Coats was fifty-nine years old.  Dkt. 1 at 3 (Compl.

¶ 6).  The Department's action was based on the proposal of Coats's direct supervisor, Phillip

Juengst, and the final determination of Ernest Canellos, an administrative law judge who was

designated to serve as the deciding official.  Dkt. 22 at 17, 24–25.

Juengst became Coats's direct supervisor in March 2011.  Dkt. 20-4 at 2 (Juengst Dep.

9); Dkt. 20-5 at 12.  Shortly thereafter, in May of 2011, Juengst met with Coats for a "mid-year

review" during which Juengst highlighted several "opportunities for growth" in Coats's work

performance.  Dkt. 20-1 at 12–14 (Coats Dep. 60–62).  At the meeting, Juengst also provided

Coats with a proposed version of his "REACH plan," a document used to track employees'

progress toward performance goals, and, after incorporating Coats's feedback, Juengst issued a

final REACH plan on June 9, 2011.  *See* Dkt. 20-5 at 15; Dkt. 20 at 12.  Two months later,

Juengst met with Coats again to inform him "that his performance, if not improved, would result

in an unsuccessful [REACH] rating."  Dkt. 20-5 at 16.  Juengst offered Coats an informal

assistance plan to help address the concerns he had identified with Coats's performance, but

Coats refused to sign the plan.  *Id.* 16–17; Dkt. 20-1 at 15–16 (Coats Dep. 63–64); *see also* Dkt.

20-7 at 17–18.

On September 22, 2011, Juengst issued a REACH rating that assessed Coats's

performance as "unsatisfactory."  Dkt. 20-7 at 23–28.  Juengst expressed "concern with [Coats's]

overall performance and productivity," *id.* at 23, placed him on a "Performance Improvement

Plan" ("PIP"), *id.* at 30–34, denied him a "[w]ithin [g]rade [i]ncrease" in salary, Dkt. 20-5 at 19,

and informed him that, if he "fail[ed] to achieve acceptable performance on critical elements"

identified in his PIP, he could be terminated from service at the Department, Dkt. 20-7 at 34.

Again, Coats refused to sign the REACH rating or the PIP, *see* Dkt. 20-7 at 28, 34, and on

February 29, 2012, Juengst issued a proposal to remove Coats from federal service, Dkt. 24-9 at

2–14.

In November 2011, Coats filed a formal EEO complaint alleging that Juengst's

September actions were taken based on his race and age and in retaliation for prior EEO actions

he had pursued in 2008 and 2010.  Dkt. 20-7 at 36–37.  In April 2012, the Office of

Management, the unit within the Department tasked with handling EEO matters, issued a written

decision rejecting all of Coats's claims.  *Id.* at 36–54.  In particular, the Office of Management

concluded that each of Coats's discrimination claims either failed to establish a prima facie case,

*id.* at 40, 47, 50, 51, or failed to show that the Department's asserted, nondiscriminatory reason

for acting was pretextual, *id.* at 46, 49, 50, 51.  The Office of Management also rejected Coats's

claim that Juengst's September 2011 actions were taken in retaliation for Coats's 2008 and 2010

EEO activity, finding that Juengst's assertion "that he was not aware of th[at] activity" more

"credible" than Coats's contrary assertion.  *Id.* at 39–40.  Although it rejected each of Coats's

Title VII and ADEA claims, the Office of Management did find that Juengst had violated the

Department's policies by issuing Coats a REACH rating fewer than 120 days after finalizing a

REACH plan.  *Id.* at 43, 45 (REACH rating issued only 105 days after REACH plan was

finalized).

Overall, the Office of Management found that, "[a]t worst, [Juengst's] actions amounted

to an administrative error," and it highlighted the "pervasive and basic errors in [Coats's] work

products."  Dkt. 20-7 at 45–46.  Nonetheless, on June 7, 2012, Juengst withdrew Coats's

"unsatisfactory" REACH rating, rescinded his PIP, and granted Coats a within grade salary

increase, explaining that he did so "out of fairness . . . because of the question raised about the

appropriateness of the timing of [the REACH] rating."  *Id.* at 56.  Although Juengst "continue[d]

to believe" his rating decision was "justified by [Coats's] unacceptable performance," he also

withdrew his proposal to remove Coats from federal service, noting that his decision to terminate

Coats's employment was "based in part or in whole on the September 22, 2011 REACH rating."

*Id.*

In May 2012, Juengst initiated another round of evaluations assessing Coats's

performance.  Just as he had the previous year, Juengst advised Coats during their midpoint

conference that he was in danger of receiving an "unsatisfactory" REACH rating, *id.* at 61;

offered Coats an informal assistance plan to address the concerns (which Coats, again, refused to

accept), *id.* at 61 n.4; issued Coats a PIP, *id.* at 61; and, ultimately, issued a second proposal in

September 2012 to remove Coats from federal service, *id.* at 59–79.  Coats alleges that about a month later, when Juengst delivered a package of materials to his office, Coats asked Juengst "why was he continuing this . . . removal process."  Dkt. 22-1 at 38 (Coats Dep. 203).  According to Coats, Juengst responded: "Frankly, Ron, it's because of your race and salary."  *Id.* at 37–39 (Coats Dep. 202–04).  Coats contends that he memorialized this startling assertion with a notation on his calendar on October 19, 2012.  *Id.* at 39–40 (Coats Dep. 204–05).

In November, Ernest Canellos, the chief administrative judge at the Department, was designated as the deciding official regarding Juengst's proposal to terminate Coats's employment.  *See* Dkt. 20-3 at 2–6 (Canellos Dep. 10, 50–52, 55).  With the assistance of an attorney, Coats submitted a response to the removal proposal.  *See* Dkt. 20-8 at 6; Dkt. 20 at 7. On February 6, 2013, Canellos determined that Coats's "performance ha[d] been deficient for more than a year," and, on that basis, he "remove[d] [Coats] from [f]ederal service."  *Id.* at 12. After exhausting his administrative remedies, *see* Dkt. 1 at 9–10 (Compl. ¶ 26); Dkt. 11 at 6 (Answer ¶ 26), Coats filed this action, Dkt. 1.

## II.    STANDARD OF REVIEW

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, as here, the plaintiff bears the ultimate burden of proof, but the defendant has moved for summary judgment, the defendant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (internal citations and quotation marks omitted).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

## III.    ANALYSIS

### A.    Title VII Race Discrimination Claim

#### 1.  *Direct Evidence*

At the summary judgment stage of a Title VII action, "the operative question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer intentionally discriminated against the employee" on a prohibited basis.  *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (quotation marks and alterations omitted).  "If 'the plaintiff offers

direct evidence of discriminatory intent, that evidence will generally entitle [the] plaintiff to a trial.'" *Id.* (quoting *Alyissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C Cir. 2013) (per curiam) (alterations omitted)); *see also Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). "'A statement that itself shows bias in the employment decision,'" moreover, "qualifies as direct evidence." *Wilson*, 753 F.3d at 247 (quoting *Alyissi-Etoh*, 712 F.3d at 576).

According to Coats, this is precisely such a case. Coats testified at his deposition that Juengst stopped by his office on October 19, 2012, to drop off paperwork related to Juengst's second proposal to remove Coats from federal service. Dkt. 22-1 at 37–40 (Coats Dep. 202–05). In response to a question from Coats as to why Juengst was "continuing . . . this removal process" after having withdrawn the prior termination proposal, Coats contends that Juengst responded, "Frankly, Ron, it's because of your race and salary." *Id.* at 37–38 (Coats Dep. 202–03). Coats also testified that he made a handwritten notation on his calendar memorializing this remarkable comment, and he authenticated the notation at his deposition. *Id.* at 39–40 (Coats Dep. 204–05). The notation read: "Phil [Juengst] stopped by my office with stack of papers—proposal removal papers. I asked why are you continuing the removal process, frankly, Ron because of your race and salary." *Id.* Coats repeatedly affirmed under oath that this exchange occurred, *see id.* at 37–40 (Coats Dep. 202–05), and he testified under oath that he believed that Juengst was speaking "seriously," and not "in jest," *id.* at 38 (Coats Dep. 203).

Viewing Coats's testimony in the light most favorable to him, as the Court is required to do in assessing the Department's motion for summary judgment, *see Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012), Coats has carried his burden of identifying direct evidence of Juengst's discriminatory purpose. The statement at issue was not a "stray remark[]," *see, e.g.*, *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (holding that a "stray" racial epithet

directed towards plaintiff's co-worker after an altercation did not constitute direct evidence), but, rather, was allegedly made in response to the question why Coats was targeted for an adverse employment action.  Nor was Juengst a peripheral co-worker disconnected from the termination process.  *See, e.g.*, *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 126 (D.D.C. 2014) (holding that allegedly discriminatory statements attributed to a university official were not direct evidence because the official "was not a decision-maker in Plaintiff's dismissal . . . [or] in any of the decisions that Plaintiff alleges were discriminatory").  To the contrary, it was Juengst who initiated the removal process against Coats and who gathered the documents reviewed by Canellos during the termination adjudication.  Viewed in this light, the statement "itself shows bias in the employment decision [and] qualifies as direct evidence."  *Wilson*, 753 F.3d at 247 (internal quotation marks and alteration omitted); *see also Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016) (cautioning courts against "dismissing" discriminatory comments as "immaterial 'stray remarks'" when "view[ing] the record in the light most favorable" to the nonmoving party).

    For his part, Juengst denies that he made the statement, *see* Dkt. 22-2 at 7 (Juengst Dep. 41); Dkt. 20 at 31, and the Department asserts that, even if Juengst did make the statement, it was, at most, "a reflection of . . . frustration" or made in a "'mocking" tone, Dkt. 20 at 33–34; Dkt. 28 at 4.  But this is exactly the sort of factual dispute that cannot be resolved on summary judgment—Coats and Juengst, both while under oath, told opposing stories, and it is for the jury to decide who is telling the truth.  To be sure, even if Juengst made the statement, it is possible that it was intended to convey just the opposite message from the one Coats urges; Juengst may have intended to answer an implicit accusation from Coats (following Coats's earlier express accusation) and to express incredulity that Coats believed that anything other than merit

8

motivated Juengst's actions.  It is not the Court's role, however, to resolve what, if anything, was said, and—even more hazardously—what was meant.  Those questions are exclusively the province of the jury.  *See George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005).

2. *Independent Decisionmaker*

The Department asserts that, "even if the Court accepts . . . Juengst's alleged statement . . . as true for purposes of summary judgment," the statement "does not call into question the honest and reasonable belief of the ultimate decisionmaker, Judge Canellos."  Dkt. 20 at 34–35.  Because Canellos conducted an "independent review" of the evidence submitted by Juengst in support of his proposal to terminate Coats, the Department continues, "any alleged improper motive on the part of . . . Juengst" should not be imputed to Canellos.  *Id.* at 35.  Coats, in turn, responds that "Juengst exercised considerable influence over the ultimate decision," and that, because Canellos "took the specific allegations of [Coats's] poor performance presented by Juengst in the proposed removal 'at face value,'" whether the taint of Juengst's alleged animus was passed along to Canellos is a factual question for the jury.  Dkt. 22 at 4.  Put differently, Coats "asserts that [Canellos] was the conduit of [Juengst's] discriminatory motives—h[is] cat's paw," *Morris*, 825 F.3d at 668 (quotation marks and alterations omitted), and thus Juengst's motives remain salient.

As the Supreme Court explained in *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011), under the "cat's paw" theory of liability, the involvement of an unbiased "ultimate decisionmaker" will not insulate an employer from liability, if: (1) a supervisor makes a proposal for an adverse employment action that is motivated by racial or other unlawful bias; (2) the supervisor intends that her proposal will "cause an adverse employment action;" and (3) the proposal "is a proximate cause of the ultimate employment action."  *Id.* at 422; *see also Morris*,

825 F.3d at 668 (applying *Staub*'s test to claims of racial discrimination and retaliation under Title VII).  Thus, "when a direct supervisor harbors discriminatory animus and influences the ultimate decisionmaker," the employer can be held liable even in the absence of evidence that the decisionmaker harbored "any discriminatory animus" himself.  *Noisette v. Lew*, 2016 WL 5674786, at *16 (D.D.C. Sept. 30, 2016).  That is precisely what Coats argues here.

The first and second prongs of the *Staub* test are easily satisfied in the current posture of the case, which requires the Court to consider the facts in the light most favorable to the nonmoving party.  *Arrington*, 473 F.3d at 333.  For the reasons discussed above, Coats has proffered sufficient evidence for a jury to find that Juengst's proposal was motivated by racial animus, *supra* pp. 6–9, and there is no dispute that Juengst intended for his proposal to lead to Coats's termination.  This, then, leaves the third prong of the *Staub* test, which requires that the direct supervisor's actions constitute "a proximate cause of the ultimate employment action."  *Staub*, 562 U.S. at 422.  This does not mean that the role of the ultimate decisionmaker must have been eclipsed by that of the employee's direct supervisor; rather, "it is common for injuries to have multiple proximate causes."  *Id.* at 420.  Thus, even if the decisionmaker exercised some independent judgment, that judgment will not be considered a "superseding cause of the harm" unless that judgment was "of independent origin that was not foreseeable."  *Id.* (citation and quotation marks omitted).  It does require, however, "some direct relation between the" adverse employment action and the supervisor's discriminatory conduct that is not "too remote, purely contingent, or indirect."  *Id*. at 419 (citation and quotation marks omitted).

The Department devotes the brunt of its argument to the third prong of the *Staub* test.  It argues that it was Canellos, and not Juengst, who made the decision to terminate Coats; that Canellos conducted an independent review and "did not rubber stamp Juengst's

recommendation;" that Canellos "spent several weeks reviewing the material that was submitted to him;" and that Coats rejected Canellos's "offer to provide additional evidence," "voluntarily chose not to fully participate in [the adjudication] process," and did not meaningfully contest the allegations against him.  Dkt. 28 at 7–8.  Coats, in turn, responds that Canellos "took the specific allegations of poor performance presented by Juengst in the proposed removal 'at face value' and that [Canellos] deferred to Juengst on the appropriate penalty."  Dkt. 22 at 4 (quoting Dkt. 22-7 at 11 (Canellos Dep. 133–34)).

As an initial matter, the Court notes that the Department's argument that Canellos's "independent review of the record in this case *by itself* forecloses [Coats's] claim," Dkt. 28 at 5 (emphasis added), is flatly at odds with *Staub* and the D.C. Circuit's recent decision in *Morris v. McCarthy*.  Those decisions hold that "[t]he 'mere conduct of an independent investigation' does not break the causal chain between a supervisor's bias and an adverse employment decision." *Morris*, 825 F.3d at 672 (quoting *Staub*, 562 U.S. at 421).  Indeed, the employer in *Staub* pressed the same argument that the Department asserts here, and the Supreme Court soundly rejected it. As the Court explained, such a rule "would have the improbable consequence that if an employer isolates a personnel official from an employee's supervisors, vests the decision to take adverse employment actions in that official, and asks that official to review the employee's personnel file before taking the adverse action, then the employer will be effectively shielded from discriminatory acts and recommendations of supervisors that were *designed and intended* to produce the adverse action."  562 U.S. at 420.  In the Court's view, that was "an implausible meaning of the text" of the statute at issue in *Staub*, "and one that [wa]s not compelled by its words."  *Id.*  The same is true of Title VII, which makes it unlawful to "discharge any individual . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1); *id.* § 2000e-2(m)

11

("motivating factor" causation applicable to race discrimination claims); *see also id.* § 2000e-3(a); *Univ. of Texas Sw. Med. Ctr. v. Nasser*, 133 S. Ct. 2517 (2013) ("but-for" causation applicable to retaliation claims).

The relevant question, then, is whether the ultimate decisionmaker acted "for reasons unrelated to the supervisor's original biased action" or report, or whether he took that action or report "into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421; *see also Morris*, 825 F.3d at 672. Here, the Department argues that Canellos's decision to remove Coats from the federal service was based on Canellos's own rigorous analysis of the evidence rather than a wholesale acceptance of Juengst's conclusions, while Coats argues that it was not. Both parties have identified evidence in the record that supports their positions. The Department, for instance, points to the portions of Canellos's deposition testimony in which he explained that he considered "inputs from both sides," "matched them up," and worked on the case "[a]lmost nonstop from the time [he] was appointed until [he] issued [his] decision," Dkt. 28-2 at 8, 22 (Canellos Dep. 51, 102), while Coats points to the portions of Canellos's deposition where Canellos repeatedly agreed that he took "Mr. Juengst's . . . assertion[s]" about Coats's work performance at "face value," *see* Dkt. 22-7 at 11 (Canellos Dep. 133–35). Similarly, the Department notes that Coats "failed to respond to most of the performance deficiencies identified in the proposal to remove," Dkt. 28 at 8, while Coats relies on his twenty-page response to Juengst's proposal to remove him, which attached nearly one hundred work-related exhibits, Dkt. 20-7 at 85–104.

The Court is, again, faced with a disputed issue of material fact, and, again, it is not the Court's role to address factual questions within the province of the jury. For present purposes, it

is sufficient for the Court to conclude that Juengst's significant involvement in the removal

proceedings—he twice drafted notices of removal and was tasked with gathering the documents

in support of those notices for Canellos's review—raises a substantial issue of fact about whether

Canellos's "decision was insulated from [Juengst's] subjective views." *Morris*, 825 F.3d at 673.

Because a "reasonable jury could find" that Canellos's "decision was swayed by [Juengst's]

subjective judgments," *id.*, the Court cannot conclude as a matter of law that Canellos's review

renders Juengst's motivation immaterial.

Accordingly, the Court will deny the Department's motion for summary judgment as to

Coats's claim of racial discrimination under Title VII.

## B.     Age Discrimination Claim

Coats also brings a claim for age discrimination under the ADEA, Dkt. 1 at 10 (Compl.

¶ 28), alleging that "circumstantial proof" demonstrates that the Department's decision to

terminate his employment was motivated by unlawful "age bias," Dkt. 22 at 3.  Because the

Department has proffered a legitimate, non-discriminatory reason for terminating Coats, the

Court "need not—*and should not*—decide whether" Coats has established a prima facie case

under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the

Court must resolve only "one central question:  Has [Coats] produced sufficient evidence for a

reasonable jury to find that the [Department's] asserted non-discriminatory reason was not the

actual reason and that the [Department] intentionally discriminated against [Coats] on the basis

of [age]?"  *Id.*; *see also DeJesus v. WP Co. LLC*, 841 F.3d 527, 532–33 (D.C. Cir. 2016)

(applying *Brady* to ADEA claims).  The answer to that question turns on whether "there is

evidence from which a reasonable jury could find that the [Department's] stated reason for

firing" Coats—his allegedly poor work performance—was "pretext" and that the Department, in fact, fired Coats because of his age. *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

Unlike his claim of race discrimination, Coats does not premise his claim of age discrimination on any direct evidence of discriminatory intent.[2]  Instead, he contends that a reasonable jury could infer that the Department discriminated against him based on his age because (1) Juengst made "repeated references to Coats'[s] retirement eligibility during the PIP period," demonstrating that Juengst was conscious of Coats's age; (2) Coats had "a long record of successful service under many different supervisors;" (3) Juengst was "on the job" for only about ten weeks before forming a critical assessment of Coats; and (4) "Juengst treated Coats far worse than . . . younger members of his staff."  Dkt. 22 at 33, 37.

The fact that Juengst made references to Coats's eligibility to retire carries little weight. The Department does not contest that Juengst was aware that Coats was a member of the class of employees protected by the ADEA—that is, he was clearly over forty years old.  Dkt. 11 at 3 (Answer ¶ 6).  There is no evidence, however, that ties Juengst's references to retirement to age discrimination.  To the contrary, Coats testified at his deposition that Juengst told his entire staff about the Department's "retirement program," which offered "buyout[s]" for retirement-eligible

---

[2]  Coats does not contend that Juengst's alleged statement that he was initiating removal proceedings against Coats "because of [his] . . . salary," Dkt. 22-1 at 37–39 (Coats Dep. 202–04), constitutes direct evidence of age discrimination, nor could he.  As the Supreme Court has observed, the ADEA prohibits employment decisions made on the basis of an employee's age but does not reach decisions made "on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993).  Here, Juengst's alleged reference to Coats's "salary" was, at most, a reference to a factor "correlated with age."

employees.  Dkt. 22-1 at 35–36 (Coats Dep. 198–99); *see also* Dkt. 22 at 12.  Coats stresses that

Juengst repeated this message to him "many times" during their PIP meetings and that he

perceived these comments as "effort[s] to pressure [him] to leave, to voluntarily retire."  Dkt. 22-

1 at 34, 36 (Coats Dep. 197, 199).  There is no dispute, however, that Juengst believed that Coats

should leave the Department.  The question is whether Coats was terminated because of his poor

performance or because of his age.  In this context, the fact that he mentioned the availability of

retirement to an under-performing employee provides no meaningful evidence of age-related

bias.

The Court is also unpersuaded by Coats's contention that his "long record of successful

service under many different supervisors" casts doubt on the performance-based rationale given

by the Department.  Rather, the undisputed evidence supports just the opposite conclusion.  The

Department, for example, has submitted Coats's performance evaluation for the period from

October 1, 2008 through September 20, 2009, two years before Juengst became Coats's

supervisor.  *See* Dkt. 20-7 at 5–9.  That evaluation, which—like those provided by Juengst—

Coats declined to sign, was not particularly flattering.  On a scale from 1 (unacceptable) to 5

(outstanding), Coats received an overall rate of 2 (minimally successful) on both the

Organizational Priorities and Customer Services elements of the evaluation.  *Id.* at 5–6.

According to the written evaluation, his "work product[] w[as] typically of low quality, required

continual monitoring, close supervision, and frequently required substantial revisions and

corrections to ensure that [it was] complete and of acceptable quality."  *Id.* at 8.  The evaluation

further noted that, "[a]lthough an inordinate number of meetings were held, and a substantial

amount of time was spent providing guidance and assistance to help him succeed and improve

his performance, . . . Coats was still unable to complete his assigned work without assistance,"

thus requiring his "supervisor and another staff member" to complete his work on a project. *Id.* And, finally, the evaluation stated that "Coats was unable to interpret and analyze data," "could not independently plan or carry out his assignments without continual supervision and guidance," "seldom took the initiative to find alternatives to resolve issues," and "did not proactively take the initiative to ensure that obstacles were timely addressed." *Id.* at 8–9. It is, accordingly, a stretch too far to contend that a reasonable jury could infer from Coats's performance history that the performance issues identified by Juengst were a pretext for age discrimination.[3]

The Court is also unconvinced that a reasonable jury could infer pretext from the fact that Juengst expressed concerns about Coats's performance just ten weeks after becoming his supervisor. The record reflects that Juengst "expressed concern about [Coats's] performance" during a "mid-point conversation" in late-May 2011. Dkt. 20-7 at 17. There is no reason to believe that Juengst lacked personal knowledge of Coats's work by that time, and Coats has offered no evidence to support such a contention. It was not until mid-August, five months into his tenure, moreover, that Juengst first "formally advise[d]" Coats that he was at risk of receiving a "rating below the 'Results Achieved' level" if his performance did not improve. *Id.* At that time, he raised specific concerns about specific projects, and he echoed the observation

---

[3] Coats argues that his 2009 "Minimally Successful" rating "does nothing to support [the Department's] motion for summary judgment" because: (1) the rating, on its own, "does not justify imposition of a performance[-]based firing;" (2) the supervisor that assigned him that rating "was himself removed . . . because of concerns about his management abilities;" and (3) Coats received a "Fully Successful" rating in 2010. Dkt. 22 at 4–5 n.1. But Coats misses the point—the Department's argument is not that Coats should have been removed because of his 2009 rating or that his 2009 rating should have informed or controlled his later ratings. Rather, the "Minimally Successful" rating that Coats received in 2009 undermines his contention that, because he had such a "long record of successful service," Juengst's negative ratings in 2011 and 2012 must have been based on discriminatory animus.

contained in Coats's 2008–2009 evaluation that the "inconsistency of [Coats's] work products ha[d] required [Juengst] to provide [Coats] with excessive direction on more than one occasion" and that "[m]ost of [Coats's] work [was] delivered behind schedule." *Id.* 17–18.   These comments reflect Juengst's personal experience in working with Coats.  And, finally, it was not until September 2011 that Juengst gave Coats his first "unsatisfactory" rating.  *Id.* at 23–28. That, of course, is not the evaluation that is at issue for present purpose.  But, to the extent that Coats contends that Juengst was laying the foundation for his later termination proposal, and that Juengst was so lacking in experience in working with Coats at that time that a reasonable jury might infer that Juengst was actually motivated by age discrimination, the record belies that contention.  To the contrary, Coats's 2010–2011 evaluation contains extensive detail regarding Juengst's personal experience with Coats's work.  *See, e.g.*, *id.* at 25 ("I have had to repeatedly correct your work;" "I had to resort to conducting the calculations myself;" "I asked that the narrative be completed by the end of June. . . .  [I]t took you until the end of July to produce draft narratives").

This, then, leaves Coats's contention that Juengst treated him "far worse than . . . younger members of his staff."  Dkt. 22 at 33.  Three propositions of law guide the Court's consideration of this argument.  First, it is settled in this circuit that "[a] plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the protected group."  *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015); *accord Brady*, 520 F.3d at 495.  Second, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury."  *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see also*

*Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015).  And, third, in order to

rely on comparator evidence to demonstrate pretext, the "plaintiff must . . . demonstrate that all

of the relevant aspects of [the plaintiff's] employment were nearly identical to those of the

[purportedly comparable] employee."  *Burley*, 801 F.3d at 301 (citations and internal quotations

omitted); *accord Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999); *Neuren v. Adduci,*

*Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  It follows that, although, the

evaluation of comparator evidence is "ordinarily" a question for the jury, it is not inevitably so.

Rather, to survive summary judgment, a plaintiff challenging a disciplinary action must identify

evidence from which a reasonable jury could find that "the relevant aspects" of his performance

and overall circumstances were "nearly identical" to those of the more favorably treated

comparators.  *Burley*, 801 F.3d at 301.

    The "[f]actors that bear on whether someone is an appropriate comparator" vary based on

the relevant circumstances.  *Id.*  In a case, such as this, involving termination based on

performance deficiencies, the relevant factors include "the similarity of the plaintiff's and the

putative comparator's jobs and job duties," whether their performances were evaluated "by the

same supervisor," whether they were subject to the same or similar performance standards, and

whether the comparator exhibited deficiencies that were similar in duration, frequency and

severity to the deficiencies that led to the plaintiff's termination.  *Cf. id.*  Coats identifies two

comparators—Comparators "A" and "B"—both of whom were senior level accountants who

worked under Juengst's supervision and who received evaluations from Juengst for the 2011

review period.[4]  Dkt. 22 at 5–9.  Neither comparator, however, is a perfect match.  Both, for

---

[4]  Although the Court recognizes that Coats went through the termination process at issue here in
2012–2013, the Court will give Coats the benefit of the doubt as the nonmoving party and will
rely, as he does, on the 2011 performance evaluations to perform the relevant comparisons.  *See*

example, were GS-14s, while Coats was a GS-15.  Comparator B, moreover, had different responsibilities than Coats and was subject to different evaluation "critical elements" and different performance standards.  Dkt. 28 at 12–13; Dkt. 24-6 at 2–7.

Comparator A, however, is a closer match.  For the September 2010 to October 2011 period, sixty percent of both his and Coats's evaluations turned on the same "critical element"— "develop[ing] and implement[ing] internal control reviews and related activities at [the Department], including A-123, Appendix A and FMFIA in order to . . . identify programs, activities, and processes that may be improved or are susceptible to mismanagement, error, or fraud and abuse; enhanc[ing] financial management practice[s] at [the Department], and[] improv[ing]  the effectiveness of [the Department's] programs."  Dkt. 20-7 at 26; *accord* Dkt. 24-5 at 2.  Both sets of evaluations also included at least some arguably similar criticisms. Comparator A's evaluation noted that "his documents often required many substantive revisions," that he was not "a self-starter in taking the initiative to move the reviews along," and that he "did not routinely meet most deadlines."  Dkt. 24-5 at 2.  Along similar lines, Coats's evaluation noted that Juengst was required to repeatedly edit and make substantive additions to Coats's drafts, that Coats demonstrated "a lack of proactive planning and initiative to move work processes along," and that his "review [was] severely behind schedule."  Dkt. 20-7 at 25. Despite these similarities, Juengst rated Coats's performance on this critical element as

---

Dkt. 22 at 2 (pointing out that the three employees "performed the same type of . . . work in the same unit during the same time period").  It is undisputed that the evaluation Juengst gave Coats in 2011 led to Juengst's proposal to remove him in February of 2012, *see* Dkt. 24-9 at 3–4, and Coats argues that Juengst's re-issuance of the proposal to remove Coats in September of 2012 was just an effort to "retrench and try again" by citing the same "problems" that he had raised in 2011–2012, Dkt. 22 at 17; *see also id.* at 2 ("Juengst began paving the way for his proposals to fire Coats within just a few months of arriving in the unit.").

"unsatisfactory," Dkt. 20-7 at 24–26, while he rated Comparator A's performance as "results

achieved," Dkt. 24-5 at 2–3, which was the second lowest rating.

The Department responds that, even though Coats and Comparator A were subject to the

same critical element, Comparator A, as a GS-14, was subject to a less demanding set of

performance standards.  Thus, while Coats was expected to produce work that was "technically

*authoritative*," Dkt. 20-7 at 26 (emphasis added), Comparator A was only required to produce

"technically *sound*" work product, Dkt. 24-5 at 2 (emphasis added), and while Coats was

expected to produce drafts that could be "accepted with few significant changes," Dkt. 20-7 at

26, Comparator A was expected to produce drafts that would be subject to "review[] only for

impact on broad objectives," Dkt. 24-5 at 2.  Given these different expectations, the Department

contends that there is no inconsistency "in Comparator A receiving a '1.0' on his 2011

performance review (the lowest possible acceptable rating) and Coats being rated at the

unsatisfactory level."  Dkt. 28 at 12.

The Department's position is a substantial one, which is further supported by the extent

and severity of criticisms contained in Coats's evaluation that are not present in that of

Comparator A.  Notably, in addition to the concerns expressed in both Coats's and Comparator

A's evaluations, Juengst expressed further concerns about the "poor quality" of Coats's work, his

difficulty "communicat[ing] effectively with program staff," his lack of preparation and

inattentiveness to detail, his failure to catch "an obvious error in the data," the "very poor logic

and analysis" contained in Coats's "revised calculation," and Coats's failure to correct his work

in response to input from Juengst.  Dkt. 20-7 at 24–25.  Coats fails to identify evidence from

which a reasonable jury could find that Comparator A's performance deficiencies were "nearly

identical" to these shortcomings.  Even more importantly, Coats does not offer any evidence

from which a reasonable jury could conclude that Comparator A's work product contained the type of persistent, uncorrected errors and flaws that Juengst described in Coats's evaluation. Coats, for example, points to the fact that Juengst indicated that Comparator A was "not detail oriented" and, in particular, that Comparator A needed to do a better job of taking notes at meetings.  Dkt. 22 at 6–7; *see also* Dkt. 22-2 at 15 (Juengst Dep. 94).  But, unlike Coats's evaluation, which reflected an inability or unwillingness to correct deficiencies, *see* Dkt. 20-7 at 25–26, Juengst wrote in Comparator A's evaluation that he had "shown improvement" in addressing this shortcoming, Dkt. 24-5 at 3.

In light of these differences, the Court concludes that no reasonable jury could find that "all of the relevant aspects of [Coats's] employment were nearly identical to those of" Comparators A or B, *Burley*, 801 F.3d at 301, or that it is possible to draw a "fair comparison" between their circumstances, *Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999).  Coats occupied a more senior position, he was subject to correspondingly more demanding performance standards, and his evaluation reflected more serious and more persistent deficiencies.  Comparisons of this type, admittedly, are not scientific, and what might suffice in one case might not in another.  Here, however, there is no other evidence that might support an inference of age discrimination.[5]  Absent evidence of some greater similarity with one of the comparators or any other evidence reflecting age bias, it is not the role of the Court—or of the jury—to "second-guess an employer's personnel decisions" about whether even modest differences in grade, performance standards, and responsiveness to comments are sufficient to

---

[5]  Notably, although the record does not reflect the age of either of the two comparators, Juengst testified at his deposition that Comparator B had "retired this past year," Dkt. 22-2 at 17, and, Coats himself repeatedly characterizes both comparators as "senior member[s]" of Juengst's staff, Dkt. 22 at 7–8.

justify the difference between the two lowest rating. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

The Court will, accordingly, grant the Department's motion for summary judgment with respect to Coats's claim for age discrimination.

## C.    Retaliation Claims

Finally, Coats brings retaliation claims under Title VII and the ADEA, alleging that the Department's termination decision constituted an unlawful reprisal against him for his past EEO activity.  Dkt. 1 at 10 (Compl. ¶ 29).  On November 23, 2011, Coats filed an EEO complaint alleging, among other things, that Juengst's decisions in September 2011 to place him on a PIP, deny him a within grade salary increase, and assign him an unsatisfactory REACH rating were the product of race and age discrimination.  Dkt. 20-7 at 36.  Juengst filed an affidavit in July 2013 acknowledging that he "was notified of [Coats's] [EEO] complaint by the Department" in November 2011, and recognizing that he had been "named" as Coats's supervisor in the complaint.  Dkt. 20-6 at 2–3.  Although that complaint resulted in a finding of "no discrimination with respect to any of [Coats's] allegations," Dkt. 20-7 at 52, it nonetheless constitutes protected activity for purposes of both Title VII and the ADEA, *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (discussing plaintiff's EEO complaint as "statutorily protected activity" in a Title VII case); *Forman v. Small*, 271 F.3d 285, 299–300 (D.C. Cir. 2001) (discussing plaintiff's EEO complaint as protected activity in an ADEA case).

For the same reasons as explained above, *see supra* pp. 6–13, the Court concludes that Coats has presented direct evidence of retaliation sufficient to defeat the Department's motion for summary judgment, at least in part.  A reasonable jury could conclude that Juengst's purported statement to Coats in October 2012—that he was initiating termination proceedings

against Coats "because of his race"—was a sarcastic reference to Coats's November 2011 EEO complaint and that it reflected Juengst's anger that Coats had filed the complaint. Indeed, the Department arguably concedes as much, noting that, "a jury could construe [Juengst's statement] . . . as a remark mocking Coats for filing an EEO claim of race discrimination." Dkt. 28 at 4. And, to take the point a step further, a reasonable jury could find that, by "mocking[ly]" referencing the complaint in his explanation for his actions, Juengst tied his adverse action— recommending Coats's termination—to Coats's protected activity. To be sure, it is possible that Juengst did not make the alleged statement and that, if he did, he meant to convey just the opposite message—that is, to express his incredulity that Coats believed that anything other than merit motivated Juengst's actions. But, once again, it is not for the Court to resolve "a genuine dispute on the 'ultimate issue of retaliation'" on a motion for summary judgment. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (quoting *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)).

This conclusion, however, does not extend to Coats's claim of retaliation under the ADEA. As noted above, the statement that Juengst purportedly made to Coats in October of 2012 contained no reference to age. Nor has Coats offered any other evidence from which a reasonable jury could infer that Juengst proposed Coats's termination because of Coats's protected ADEA activity. Rather, to the extent that Coats's opposition brief offers any arguments in support of his retaliation claims at all, it is in the context of race-based retaliation. *See, e.g.*, Dkt. 22 at 37 (asserting that Juengst's reaction to being "accused of racial bias is indicative of retaliatory animus").

Accordingly, the Court will deny the Department's summary judgment motion as to Coats's Title VII retaliation claim and will grant its motion as to Coats's ADEA retaliation claim.

## CONCLUSION

The Department's motion for summary judgment, Dkt. 20, is hereby **GRANTED** in part and **DENIED** in part.  The Court grants the Department's motion for summary judgment as to Coats's claims of discrimination and retaliation under the ADEA, but denies its motion for summary judgment as to Coats's claims for discrimination and retaliation under Title VII.

**SO ORDERED**.


<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge


Date:  February 8, 2017